PETROPLUS, JUDGE:
The above entitled Claim arises from the application of concentrations of calcium chloride, sodium chloride, rock salt, and other chemical solutions to U. S. Route 50 at the top of the Allegheny Front near the intersection of said Route 50 with Route 5 in Mineral County, West Virginia, said roadway being adjacent to the property of the Claimant. The Claimant alleges that the continuous application over a period of time of poisonous chlorides on said highway for deicing purposes contaminated his water supply, making it unusable for human consumption and unsuitable for bathing, washing and other domestic uses. He contends that a well on his property which had regularly and consistently produced over 400 gallons of water per hour over a period of eleven years has now been reduced in quantity to approximately 40 gallons per hour, totally inadequate for the necessities of his family and a tourist stop business operated on his property adjacent to Route 50. Claimant requests monetary damages in the aggregate amount of $72,300.00 for the following items:
Loss of business during 1969 tourist season $10,500.00
Loss of business during 1970 tourist season $15,700.00
Hospitalization cost for plaintiff and wife, Potomac Valley Hospital, Keyser, W. Va. $ 750.00
Doctor’s fees in connection with hospitalization and continual treatment for calcium chloride poisoning $ 350.00
*184 Loss of 450 g.p.m. high quality well $25,000.00
Pain, suffering and inconvenience due to fever, dry cough, and inability to sleep for eleven months, combined with general malaise $20,000.00
TOTAL $72,300.00
In addition to property damage, including the well and vegetation, loss of his souvenir shop and tourist business, Claimant attributes the illness of himself and family and the deterioration of their health to the drinking of the contaminated water from the well and seeks damages for personal injuries and medical expenses. The Respondent substantially denies all of the allegations except that it is admitted during certain winter months calcium chloride and other chemicals were applied to the road surface in reasonable amounts to impede freezing and make travel safe in the mountainous area of the Allegheny Front. It is also admitted that Claimant’s property fronts approximately 600 feet on Route 50 and is lower in elevation to the road surface where the chemicals were applied and lower in elevation to bins where such chemicals were stored by the Respondent, about 800 feet away at a State Road Maintenance Station.
Testimony was taken in the above-styled Claim on November 15, 1971, and after a lengthy hearing involving expert witnesses, chemical analyses on the condition of the water, photographs of the area in question and the testimony of a number of employees of the Respondent, the Court makes the following findings of fact.
Harry C. Henderson, Claimant, owned and operated a tourist stop business in the Allegheny Mountains, the area being a scenic mountainous terrain approximately 3,000 feet above sea level. The property was purchased in 1956 and bordered approximately 600 feet on and below the highway. In addition to a novelty shop and tourist stop business, claimant and his family used said property as a residence. In the year 1956 a well was drilled on the property 50 feet in depth, producing approximately 420 gallons per hour of good palatable water and at the time the claim was filed, the water flow had been reduced to 25 gallons per hour of contaminated and polluted water, having a vinegar smell, unfit for human consumption and use because of heavy concentrations of manganese and other salt chemicals. The topography of the area is such that surface water *185 drains from higher elevations and other properties 600 to 800 feet in distance from claimant’s property. A gas station is near his property as well as a State Road Commission Maintenance Station on which the chemicals are stored. There are visible traces of dying vegetation as well as wilted trees on the claimant’s property and areas of rock salt seepage are visible on claimant’s property. Claimant has a health history of undiagnosed ailments, sore throat, dry hacking cough, and general debilitation which he attributes to the use of contaminated water. Mrs. Helen Henderson, his wife, established by her testimony that the water was unfit for domestic purposes such as bathing, washing and cooking, and eventually water had to be supplied to the property by transportation from another area. It is not denied that claimant’s property has suffered substantial deterioration over a period of years because of the drainage and water problems. No explanation was offered in evidence as to the cause of the diminished water supply.
As for the conclusions of law, although claimant based his claim on negligence and excessive use of chemicals by the respondent in the area of his property, the evidence submitted does not support these charges of negligence. The case must be considered on the basis of the invasion of the claimant’s property rights and interference with a reasonable enjoyment of his property. It appears from the evidence that the claimant and his wife made little or no effort to mitigate damages by seeking another source of water by drilling wells or having water transported to the premises, but persisted in using the inadequate and contaminated water until they were forced to suspend their business and seek medical treatment for their health problems.
It is common knowledge that percolating waters in mountainous areas ooze, seep, and filter through the ground under the surface without definite channels to properties on lower elevations. The course of subterranean water is uncertain and unknown and not discoverable from the surface. Gravity controls in such situations and wells in a lower strata rise and fall from the pressure of percolating waters. It is a difficult problem to prove that a well is injured, destroyed or endangered .by the use of neighboring properties.
It is also well settled law that adjoining property owners have correlative rights and must make a reasonable use of their property as not to injure the property of others. Any injury that may result by interference with the natural flow of water which is incidental to *186 a lawful and proper use of the property is “damnum absque injuria”. The rule of nonliability has been applied in cases where a water supply is incidentally cut off or diminished arising from the lawful and reasonable use of adjoining property.
If negligence had been established in this case, a recovery would have been allowed to the claimant. From the transcript of the testimony we conclude that although noxious substances caused the pollution of the claimant’s well, the damage came from the operation of natural forces which do not constitute an actionable wrong unless this Court is prepared to hold that the respondent must refrain from the use of deicing procedures in the maintenance of its roadways during the winter months. It would appear that travel would become extremely hazardous in mountainous areas if the State refused or neglected to take reasonable measures to protect the traveling public.
Unfortunately, in the expanding economy of our State, roads in mountainous areas cannot be closed during the winter months to vehicular traffic to protect adjoining property owners from the noxious drainage of salts and chemicals which are reasonably required to remove the hazards of ice and snow on the highways, and make them passable.
The testimony clearly established that approximately 200 bags of chemicals were used by the respondent over a road area of 39 miles. According to the uncontradicted testimony of witness William B. Rannells, District Engineer for the respondent, who testified from the records of the respondent, each bag contains 100 pounds of chlorides which were applied over 31.9 miles, mixed with chips, for the entire winter of 1970, depending upon temperature. Prorating the same on the road adjacent to Mr. Henderson’s property, approximately 121 pounds of chemicals were applied to the road surface, during the winter of 1969-1970, twenty-five per cent of which would be subject to drainage towards his well area. The rest would be carried away through drainage alignment. Admittedly, about 30 pounds of calcium chloride would drain as a maximum and run off onto the claimant’s property. Because of the steep grades, the engineer further stated the amount seeping into the ground would be very small and the residue would be dissipated in drainage over the mountain.
The conflicting interests of the traveling public and the protection of adjacent private properties must be weighed and it is most difficult *187 to make an award in this case, where negligence or excessive use of chemicals on the roadway has not been established. This Court will hold that a reasonable use of deicing chemicals on roadways is a public necessity and that the emphasis must be placed on traversable highways. The consequential damage, if any, to the claimant’s water supply would not be compensable as an unreasonable invasion of the claimant’s property rights.
The written complaint confines its charges to drainage of contaminants from the highway, and on this state of the pleading we conclude there is no legal liability. It will not be necessary to consider the propriety of claiming damages for consequential loss of business, illness and medical expenses.
On the other hand, at the hearing photographs were introduced without objection which were taken by claimant in October, 1971, more than one year after the filing of this claim. They depict a method of storing road salt in open bins on a higher elevation about 600 feet from claimant’s property, and disclose a circumstance that disturbs this Court. The State has taken no precautions to confine the chemicals in leak proof bins and it is obvious that seepage from the bins has discolored and contaminated the land in a wide area around the bins, possibly extending to claimant’s property. There is no evidence that this haphazard method of storage existed prior to August 18, 1970, the date of the filing of this claim, and claimant utterly failed to introduce any proof that the faulty storage of chamicals on respondent’s property was the proximate cause of claimant’s damage, relying solely on continuous application of calcium chloride to the road surface as the sole cause of the damage. We have disposed of this lateral question in the foregoing opinion, but feel constrained by a sense of fairness to this claimant to keep this claim open for additional proof on the storage of chemicals and the effect this might have. This court may be furnished evidence if it is available, that large quantities of salt were stored on respondent’s land in such a manner that the action of rain and melting snows would inpregnate claimant’s land through percolation so as to render the water supply of claimant unfit. Upon such proof, if satisfactory, an award could be made. As the record now stands the method of storage depicted in said photographs does not relate to claimant’s prior damages which occurred a number of years before the photographs were taken.
*188 If there is a causal connection between improper storage of salt on respondent’s property and claimant’s damages, it may be alleged and proved in the reopening of this claim.
In conclusion, in accordance with the foregoing opinion no award is recommended under the facts and present state of the record of this case.
Claim disallowed.